EMIL MUDRA ET AL., APPELLANTS, V. HERMAN GROELING, APPELLEE.

FILED SEPTEMBER 25, 1911.   No. 16,521.

Acknowledgement, Authority to Take. M., being indebted to various banks and individuals who held chattel mortgages upon all of his personal property, sold his homestead, consisting of

160 acres of land, to G., and, his wife joining, executed a deed therefor to G. At the time of negotiating the sale, and prior to the execution of the deed, M. directed G. to pay the consideration for such sale, less certain incumbrances upon the land, to the creditors of M. One of the creditors of M. was D., who, as a notary public, took the acknowledgment of M. and wife to their deed to G. D. was in no manner instrumental in causing the sale of the land or the giving of such oral directions by M. to G., but immediately prior to taking such acknowledgment D. was informed of such sale and oral directions. After the execution of the deed, G. paid the full amount of the net consideration of his purchase of the homestead to such creditors of M., including D. *Held*, That D. was not disqualified to act as notary in taking such acknowledgment.

APPEAL from the district court for Knox county: ANSON A. WELCH, JUDGE. *Affirmed.*

*J. F. Green* and *W. A. Meserve,* for appellants.

*J. H. Berryman* and *Calvin Keller, contra.*

FAWCETT, J.

Plaintiffs brought suit in the district court for Knox county to set aside a deed to their homestead, consisting of 160 acres of land in said county, and to quiet their title thereto, and from a decree of the district court dismissing their suit and quieting defendant's title to the land in controversy they prosecute this appeal.

It is not disputed by plaintiffs that on January 22, 1909, they signed the deed in controversy, but they contend, first, that at the time they signed the deed they thought it was a mortgage; and, second, that T. A. Drayton, who took the acknowledgment, had such an interest in the transaction as disqualified him from taking the same. In other words, that the deed was never acknowledged in accordance with the statutes of this state relating to the conveyance of a homestead. The latter point is the only one argued in plaintiffs' brief, and hence is the only one that will be considered here. Owing to the unfortunate condition in which the decree of the district

court leaves the plaintiffs, we have examined this case with great care. The writer has twice carefully read the entire record. It would serve no good purpose, and would unnecessarily extend this opinion, to set out the evidence of the respective parties in detail. We think a clear preponderance of the evidence shows that on January 20, 1909, plaintiff Emil Mudra was to all intents and purposes a bankrupt. He was heavily indebteded to two banks at Orchard, Nebraska (which, for brevity's sake, we will designate as the Farmers Bank and Citizens Bank, respectively), and to certain individuals who were officers and stockholders in those banks. The only security held by the banks consisted of chattel mortgages upon the personal property of Emil. He was also indebted to the defendant in the sum of approximately $900, a portion of which was also secured by a chattel mortgage. On the day named a representative of each of the two banks together visited the farm of the plaintiffs' for the purpose of checking up their several chattel mortgages and ascertaining whether or not plaintiffs actually had the live stock purporting to be covered thereby. They were unable to find all of the stock upon the farm, but were told by Emil that something like 30 head of the stock was at another place about 15 miles distant. The representatives of the banks had obtained an abstract from the county clerk of the chattel mortgages which had been given by plaintiffs. Their examination satisfied them that their security was insufficient, also that there would be some difficulty in determining the rights of the several mortgagees on account of the careless manner in which plaintiff Emil had listed the stock when giving the various mortgages. While they were at the farm the question of a public sale of all of plaintiffs' personal property was discussed. Plaintiff Emil says the sale was suggested by the representatives of the banks, but they say that it was suggested by plaintiff. However that may be, the representatives of the banks insisted upon a new chattel mortgage, running

jointly to a representative of each of the two banks, covering the entire stock. Such a chattel mortgage was drawn, and signed by plaintiff Emil. It was then agreed that a public sale should be held in the near future and all of the property sold; that representatives of the two banks should act as clerks at that sale and handle and distribute the proceeds among the creditors *pro rata*. After the chattel mortgage had been signed, the repre-- sentatives of the banks prepared a mortgage upon the homestead, subject to two prior mortgages, one for $1,600 and the other for about $200, as additional security to their loans. Plaintiff Emil signed this mortgage, but Mrs. Mudra refused to join, insisting that the personal property ought to pay the banks what was due them. Thereupon the bank representatives started home. On their way they stopped at the home of defendant, whose farm adjoined that of the plaintiffs, where they remained for supper. During their interview with defendant they asked him how much of a claim he had against plaintiffs. Defendant was unable to state the exact amount, but gave it approximately. The bank representatives then asked defendant if plaintiff had 30 head of stock at another place 15 miles distant. Defendant answered to the effect that it was possible plaintiff had such stock, but that he had never heard of it, and doubted his having the same. It was then agreed between the representatives of the bank and defendant that, so far as they could consistently do so, they would act together in trying to protect their mutual interests. On the next morning, January 21, de- fendant appeared at the home of plaintiffs, and said to plaintiff Emil: "You're a deuce of a fellow to claim to have 28 or 30 head of cattle out north; you are making things worse in place of better, and they are talking about sending you over the road." Defendant also said that he would like to help them out if there was any way he could do it. Mrs Mudra testified that defendant said he would lend them $800 or $1,000 and take a second mort- gage on their homestead. Defendant denies this, and says

his offer was to purchase the farm for $4,000, with an agreement that they might have it back any time within a year if they would repay him his money with interest; that Mrs. Mudra was not satisfied with one year, but wanted to make it three years; that he objected to three years as being too long a time, but finally agreed to give them two years; that he told plaintiffs to think the matter over and telephone him that evening as to their decision, and, if they decided to accept his offer, to come over the next morning and they would go to town together and close the matter up; that some time that evening some one from plaintiffs' home telephoned to some member of defendant's family that they had decided to accept his offer, and would be over the next morning to go to town with him; that on the next morning, January 22, plaintiffs appeared at the home of defendant, and informed him that they were ready to go to town to carry out the arrangement; that he got into the buggy with them, and they started for Orchard; that he rode with them about two-thirds of the way when they were overtaken by a neighbor, and, on account of the crowded condition of the buggy in which they were riding, he rode the rest of the way with the neighbor; that while they were all riding together plaintiff Emil said to him, "Now, being as I have sold the place, I don't want to sell all of my personal property; I will keep out several of the best horses and some cows," evidently under the supposition that the proceeds of the sale of the land would reduce his indebtedness to such an extent that it would not take all of the personal property to pay the remainder. Plaintiffs deny that Emil made this statement. However that may be, when they arrived at Orchard, defendant went to the Farmers Bank, and told the cashier that he had bought Mudra's farm; that they had come to town for the purpose of executing the deed; and that under his arrangement with Mudra he was to turn over all of the cash coming to the Mudras from this sale to Mudra's creditors. Mudra went to the Citizens Bank, and made substantially the same

statement to the cashier of that institution. Mr. Drayton, the cashier, then telephoned to the Farmers Bank that the Mudras were there, and for them to come over. Thereupon, the cashier of the Farmers Bank and defendant went to the Citizens Bank, where matters were talked over by the cashier of the Farmers Bank, the president and cashier of the Citizens Bank, and the Mudras. Mr. Thornton of the Farmers Bank prepared a deed to the land from the Mudras to defendant. The deed was signed by both Mr. and Mrs. Mudra, and the acknowledgment taken by T. A. Drayton, cashier of the Citizens Bank. There is some conflict in the evidence as to whether or not the deed was read to the Mudras, but we think a clear preponderance of the evidence shows that, while the entire deed was not read to them, the description was read, the consideration, etc., and that the acknowledgment was formally taken by Mr. Drayton. After the deed had been signed, Mrs. Mudra spoke about the agreement that they should have a certain time within which to get the land back. Thereupon, Mr. Thornton prepared, and defendant signed, a written defeasance as follows: "Orchard, Nebr., Jan 22 1909  I Herman Groeling, having this date bought of Emil Mudra the N W of 30-30-7 for $4,000 in hand paid to said Mudra, do hereby agree to permit the said Emil Mudra to redeem said land at any time within two years from this date for the sum of $4,000 with interest at 10% and on payment of any improvements which the said Herman Groeling may put on said property. (Signed) H. Groeling. In the presence of T. A. Drayton." This paper was given to Mrs. Mudra. Mrs. Mudra testified that, when she signed the deed, she thought she was signing a mortgage; that the written defeasance was not read to her, and that she did not know its contents until she returned home that evening, when she then discovered from the reading of that instrument that the paper which she had signed that day was a deed instead of a mortgage. After the deed had been signed, defendant asked the bankers if they wanted the cash, or

if they would take his notes, as he was a little short of cash at that time. They replied that they were perfectly willing to take his notes. As they were unable then to determine the exact amount of the liens upon the land, defendant executed to Mr. Drayton, of the Citizens Bank, a note for $600, and to Mr. Thornton, of the Farmers Bank, a note for $400. Some 10 or 15 days thereafter, after the exact amount of the mortgages upon the land with interest and the amount of taxes had been ascertained, it was discovered that the incumbrances were a little less than they had supposed, and that it would be necessary for defendant to pay to the banks a small amount in excess of the notes which he had previously given, whereupon new notes were given for the increased amounts, which was less than $100 in each case. These notes were subsequently paid by defendant. At the time these transactions were had, the Citizens Bank, of which Mr. Drayton was cashier and a director, and, as we think the evidence fairly shows, a stockholder, held for collection one of the notes which it had held against Mudra, but which it had rediscounted at the First National Bank of Norfolk. It further appears that at the time this note was rediscounted at the Norfolk bank T. A. Drayton personally guaranteed the payment of the note, and this personal guaranty was still outstanding at the time of the transactions above set out. A portion of the money received by Drayton from defendant as a part of the consideration for the purchase of plaintiffs' land was indorsed by Drayton upon this note, which he had personally guaranteed. This fact, together with the fact that Drayton was also interested as a stockholder in the Citizens Bank, form the basis of plaintiffs' contention that Drayton was disqualified to act as notary in taking the acknowledgment of the plaintiffs to the deed in question; and upon this point the case turns. The district court held that he was not disqualified, and in this holding we think the court did not err.

It will be seen from what has been stated that neither

Mr. Drayton nor his bank had anything to do with the purchase of the land from plaintiffs by defendant. That was purely a matter between them. Drayton was not advised of the sale and purchase until after its terms had all been agreed upon and the parties appeared at Orchard for the purpose of executing the deed. Nor does it appear that he was in any manner instrumental in the verbal direction given by Mudra to defendant to turn over to the creditors, of which Drayton was one, the cash consideration which otherwise would have been payable to plaintiffs. We are unable to see how the fact that plaintiff gave defendant this direction and subsequently permitted it to be carried out can be held to disqualify Mr. Drayton as a notary in taking the acknowledgment. ,The direction of Mudra to defendant to turn the money over to the creditors was verbal. It was not induced by Drayton, and, being for the proceeds of the sale of a homestead, could not, under our statute, have been enforced by him against defendant, if the Mudras, after executing the deed, had changed their minds, canceled their verbal direction to defendant, and demanded of him that he turn the money over to them. If they had taken that course, defendant would have been obliged to comply with their demand and pay them the money, and neither Mr. Drayton nor any of the bank officials could have prevented his doing so. That the Mudras knew defendant was going to pay the money over to the creditors, including Drayton, is beyond question, and we think a clear preponderance of the evidence shows that they knew when they signed the deed that it was in fact a deed, and not a mortgage. If they did not know it then, they at least knew it, according to their own testimony, that evening when they read the written defeasance which defendant had given Mrs. Mudra. After having read that paper and then learned that they had executed a deed to defendant for their farm, and knowing that he was going to pay the consideration of the sale to the creditors, they took no steps to prevent the consummation of the deal by defendant until the

commencement of this suit three weeks later. Defendant lived on the adjoining farm, and we think it is a fair inference that, if upon their return home that evening they found they had been deceived into executing a warranty deed when they thought they were only giving a mortgage, they would have appeared at defendant's home bright and early the next morning to repudiate the entire transaction. It may be said that they acted promptly in commencing this suit three weeks later, but there is another significant circumstance in the case which explains the commencement of the suit without any previous protest. As we have said, it was agreed between the representatives of the banks and plaintiff Emil at the time the representatives visited his farm and took the last chattel mortgage covering all of the property, which was two days prior to the execution of the deed, that they would have a sale and sell off all of the personal property; plaintiff stating that he wanted to sell everything and pay his debts. It was then arranged that the bank representatives should get out the sale bills and engage the auctioneers. This was done and the sale made on January 28. The sale of the personal property netted $3,093.41, which was evidently much less than plaintiffs expected to realize therefrom. The proceeds of the sale of the land, after deducting the incumbrances, added to the amount realized from the sale of the personal property, did not entirely pay all of plaintiff's liabilities; so that he found himself, after the sale on January 28, without either farm, farm implements, or stock. It then evidently dawned upon plaintiffs that they had made a mistake in turning over their homestead, and it was after that that they probably consulted counsel and brought the present suit in an effort to regain it. We greatly sympathize with the unfortunate plight in which plaintiffs were left, but we are unable to discover any evidence of fraud, misrepresentation or overreaching on the part of the creditors. It was patent to plaintiffs on January 22, when they executed the deed, that they had made a failure of farming, that they would

in any event have to give up all of their personal property, and that all they would have left would be the farm which was incumbered for about one-half of its value. They evidently indulged the hope that, if they sold the land to defendant and applied the money which would be coming to them from such sale upon their indebtedness, they would have a surplus at the time of the sale of the personal property, which would enable them to retain some of the horses and cows, or that they would have a cash surplus coming to them. However that may be, and however unfortunate the final outcome of their transactions has proved to be, we are unable to see how we can give them any relief.

In *Wilson v. Griess,* 64 Neb. 792, cited by plaintiffs, a national bank, which held for collection a note of another bank of which it was a large stockholder, took a renewal thereof and included in the renewal note its own unsecured debt against the maker, and at the same time obtained a mortgage upon the homestead of the debtor, signed by himself and wife, to secure the new note, and we held that the assistant cashier, who was a director and stockholder of the bank, was disqualified to act as notary in taking the acknowledgment. In *Chadron Loan & Building Ass'n v. O'Linn,* 1 Neb. (Unof.) 1, we held that a mortgage upon a homestead, acknowledged by a notary who was likewise an officer and stockholder of the corporation, mortgagee, is invalid. In each of the above cases it will be observed that the notary was an officer and stockholder of the corporation named as grantee in the instrument acknowledged. We are unable to see how those cases can be considered as authority in this. In *Horbach v. Tyrrell,* 48 Neb. 514, the notary who took the acknowledgment was shown to be secretary and treasurer of the corporation, mortgagee, but it was not shown that he was a stockholder in the corporation, and we held that he was not disqualified. In *Watkins v. Youll,* 70 Neb. 81, the deed was acknowledged before one Barnum, who was acting as an agent for the purchaser

Watkins; his contract being that for each quarter section deeded to Watkins he should have a commission of $50. It will be seen that in that case Barnum was the active agent who made the purchase of the land for Watkins—a very different position from that occupied by Drayton, in the case at bar, who had nothing whatever to do with the bringing about of the sale of the land from plaintiffs to defendant. The above are all of the cases cited by plaintiffs from this court. The cases from other courts, cited, show that in each of them the person taking the acknowledgment, or the corporation in which he was a stockholder, was named in the instrument acknowledged as a beneficiary. Such cases are not in point.

We have not only examined the authorities cited by plaintiffs as shown above, but have also made an independent examination ourselves, and have been unable to find a case in any court which goes to the extent of justifying us in holding that Mr. Drayton, under the circumstances shown in this case, was not a competent officer to take the acknowledgment of plaintiffs to their deed to defendant. Upon the whole record, we are constrained to hold that the judgment of the district court is right, and it is

AFFIRMED.

SEDGWICK, J., not sitting.